UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

AUTUMN PREGIZER

        Plaintiff,                              Case No. 1:25-cv-11374

v.                                              Honorable Thomas L. Ludington
                                                  United States District Judge

MYMICHIGAN HEALTH and MYMICHIGAN
MEDICAL CENTER–WEST BRANCH,

        Defendant.
_____/

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO DISMISS IN PART AND DENYING IN PART**

On May 12, 2025, Plaintiff Autumn Pregizer filed this case as the personal representative of the estate of Kimberly Ann Washburn. Washburn was a fifty-eight-year-old woman who initially presented to MyMichigan Medical Center–West Branch ("MyMichigan–West Branch") with a severe headache, fatigue, and nausea on May 13, 2023. Plaintiff alleges that Mrs. Washburn was suffering from an emergency medical condition (EMC). Still, the medical professionals at MyMichigan–West Branch sent her home without (1) conducting appropriate screening of her ailment, or (2) stabilizing her medical condition.

Washburn came back several more times to MyMichigan–West Branch but she was sent home with medication on most of those visits. During a presentation to MyMichigan–West Branch on May 27, 2023, she was transferred to the neurology Intensive Care Unit (ICU) at Ascension St. Mary's Hospital in Saginaw Michigan, after a CT scan at MyMichigan–West Branch revealed an intercranial hemorrhage. She was then discharged on May 30, 2023.

From that time forward she would present to MyMichigan–West Branch several more times, complaining about the same severe headache; each time being discharged back home. But

on July 31, 2023, Washburn presented to MyMichigan–West Branch one final time—this time complaining of left-sided weakness and a facial droop. Another CT scan of Washburn's head uncovered a significant bleed. She was transferred to MyMichigan Medical Center–Midland. On August 1, 2023, she underwent a right frontal craniotomy to remove a right frontal hemorrhage in her brain. But Washburn would not recover, dying on August 8, 2023.

Plaintiff argues that Defendants MyMichigan–West Branch and parent company MyMichigan Health violated the Emergency Medical Treatment and Active Labor Act (EMTALA) by (1) providing Washburn with inadequate screening, and (2) releasing her from MyMichigan–West Branch each time without stabilizing her while she suffered from an EMC. Defendants move to dismiss Plaintiff's Complaint. Within that Motion to Dismiss, Defendants also seek to strike from the Complaint "pictures" of the doctors and images of Washburn's medical records.

For the reasons explained below, Plaintiff has pleaded sufficient facts to survive Defendants' Motion to Dismiss as it pertains to some of her EMTALA claim. So Defendants' Motion to Dismiss will be granted in part and denied in part. Further, Defendants' Motion to Strike will be granted because the images of Washburn's physicians are irrelevant, and the pictures of her medical records are redundant.

I.

A.

On May 13, 2023, Kimberly Ann Washburn presented to the emergency department at Defendant MyMichigan–West Branch with complaints of a severe, throbbing frontal headache, fatigue, and nausea. ECF No. 1 at PageID.6. There, she reported a history of migraines and expressed that this headache was more persistent than usual. *Id*. She was seen by emergency

medicine physician Erich Kirkland.[1] *Id.* Kirkland performed a medical screening examination (MSE)[2] of Washburn, concluding that her symptoms reflected an "unspecified headache." *Id.* Kirkland seemingly gave Washburn an IV of Saline and Toradol, Reglan, and Benadryl before discharging her from MyMichigan–West Branch with marginal relief of her symptoms. *Id.* at PageID.7–8. Plaintiff contends that Kirkland failed to perform diagnostic testing, including either a CT scan or an MRI, which were crucial to rule out a more serious diagnosis. *Id.* at PageID.6–7. Plaintiff further contends that Kirland ignored Washburn's symptoms, writing her off as a "malingerer and/or a medication seeker." *Id.* at PageID.7.

On May 24, 2023, Washburn again presented to MyMichigan–West Branch, this time complaining of a high-grade headache, dizziness, and nausea. *Id.* at PageID.8. For that visit, Washburn came under the care of emergency medical physician Walker Foland.[3] Foland completed an MSE and documented a differential diagnosis[4] that included a subarachnoid[5] and intracranial

---

[1] Physician Kirkland is not a named Defendant in this lawsuit.

[2] "A medical screening exam (MSE) is the initial exam performed when a patient presents to a dedicated emergency department and requests care. MSEs are to be performed by a qualified medical person, which should be determined in the hospital or health system's bylaws. The goal of a medical screening exam is to determine if there is an emergent medical condition occurring." *Medical Screening Exam*, APOLLOMD, (last visited December 4, 2025), https://apollomd.com/glossary/what-is-a-medical-screening-exam/ [https://perma.cc/HC8E-34MM].

[3] Physician Foland is also not a named Defendant in this lawsuit.

[4] A differential diagnosis is a list of possible conditions that could cause a patient's symptoms. *Differential Diagnosis*, CLEVELANDCLINIC.ORG, (last visited December 4, 2025), https://my.clevelandclinic.org/health/diagnostics/22327-differential-diagnosis.

[5] A subarachnoid hemorrhage is bleeding in the space between the brain and the tissues that cover the brain. *Subarachnoid hemorrhage*, MAYOCLINIC.ORG, (last visited December 4, 2025), https://www.mayoclinic.org/diseases-conditions/subarachnoid-hemorrhage/symptoms-causes/syc-20361009 [https://perma.cc/CS7P-QCKJ]. The symptoms include a sudden, severe headache, and may cause nausea, vomiting, a stiff neck, among other symptoms. *Id.* It is a type of stroke. *Id.* Online sources identify it as a medical emergency that needs to be treated immediately because it can progress to permanent brain damage or death. *Id.*

hemorrhage.[6] Foland gave Ms. Washburn Toradol, Tylenol, Haldol, and Zofran before discharging her from MyMichigan–West Branch without reporting whether her symptoms had improved. *Id.* at PageID.9–10. Again, Plaintiff alleges that Washburn was "[written] off… as a malingerer and/or medication seeker." *Id.* at PageID.9. Plaintiff asserts that because the MSE disclosed a differential diagnosis of subarachnoid and intracranial hemorrhage, Washburn should have received stabilizing treatment before she was discharged. *Id.* at PageID.10.

The next day, May 25, 2023, Washburn presented for a third time to Defendant MyMichigan–West Branch, again complaining of a severe headache. *Id.* Like the second time, Foland was her physician, and he again completed her MSE and documented a differential diagnosis that included a subarachnoid and intracranial hemorrhage. *Id.* Plaintiff alleges that Washburn was again treated like a "malingerer and/or medication seeker." *Id.* at pageID.11. And Plaintiff again argues that Defendants did not stabilize Washburn before discharging her. *Id.*

Two days later, on May 27, 2023, Washburn presented for the fourth time to MyMichigan–West Branch, complaining of "excruciating symptoms of a migraine." *Id.* at PageID.12. This time, she came under the care of emergency medicine and family medicine nurse practitioner Sarah Somerfield.[7] *Id.* Washburn reported that her migraine made her "feel[] as though her head [was] going to explode," and she had associated nausea and blurred vision. *Id.*

---

[6] An intracranial hemorrhage, also referred to as a "brain bleed, is a type of stroke that causes bleeding in one's head. *Brain Bleed, Hemorrhage (Intracranial Hemorrhage)*, CLEVELANDCLINIC.ORG, https://my.clevelandclinic.org/health/diseases/14480-brain-bleed-hemorrhage-intracranial-hemorrhage [https://perma.cc/TQN5-SPFB]. When an intracranial hemorrhage occurs, a blood vessel leaks blood or bursts; causing pressure in the brain, which prevents oxygen and nutrients from reaching the brain tissue and cells. *Id.* Online resources consider an intracranial hemorrhage a life-threatening medical emergency. *Id.*

[7] Nurse Practitioner Somerfield is not a named Defendant in this lawsuit.

During this fourth presentation, Washburn underwent a CT, without contrast scan, of her head, which revealed an "[i]ntracranial hemorrhage: hemorrhagic lesion in the right parietal lobe," and a reactive edema[8] around the lesion. *Id.* at PageID.13. A "Red Critical Result"[9] was allegedly communicated to Somerfield, and Washburn was transferred to the neurotology Intensive Care Unit (ICU) at Ascension St. Mary's Hospital ("St. Mary's")[10] in Saginaw, Michigan. *Id.*

While at St. Mary's, Washburn underwent computed tomography angiography (CTA),[11] which revealed "some vascularity around the lesion and superiorly concerning for an AVM[12] or dural AV fistula."[13] *Id.* On May 29, 2023, seemingly while still at St. Mary's, Washburn underwent

---

[8] "'Cerebral edema' is the medical term for brain swelling, or swelling that happens in part or all of your brain because of excessive fluid buildup in the tissue*." Cerebral Edema (Brain Swelling)*, CLEVELANDCLINIC.ORG, https://my.clevelandclinic.org/health/diseases/cerebral-edema-brain-swelling [https://perma.cc/XL38-FMRE].

[9] In some hospitals, a "[r]ed alert" critical value are "those laboratory results that are the most urgent and may require clinical intervention . . . " *Critical Values List*, BROWNUNIVERSITYHEALTH, https://www.brownhealth.org/centers-services/laboratories/health-care-provider-resources/critical-values-list#:~:text=Red%20alert%20critical%20values%20are,the%20Patient%20Safety%20Care%20Committee [https://perma.cc/92SP-MLY2].

[10] Ascension St. Mary's Hospital is not a named Defendant in this lawsuit.

[11] "CT angiography is a type of medical test that combines a CT scan with an injection of a special dye to produce pictures of blood vessels and tissues in a part of your body." *What is computed tomography (CT) angiography?*, JOHNSHOPKINSMEDICINE, https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/computed-tomography-angiography-cta.

[12] "An arteriovenous malformation, also known as an AVM, is a tangle of blood vessels that creates irregular connections between arteries and veins. This disrupts blood flow and prevents tissues from receiving oxygen. An AVM can occur anywhere in the body, including in the brain." *Arteriovenous malformation*, MAYOCLINIC.ORG, https://www.mayoclinic.org/diseases-conditions/arteriovenous-malformation/symptoms-causes/syc-20350544 [https://perma.cc/7F6A-UFXC].

[13] "Dural arteriovenous fistulas (dAVFs) are irregular connections between arteries and veins. They occur in the tough covering over the brain or spinal cord, known as the dura mater. The irregular passageways between arteries and veins are called arteriovenous fistulas, which can lead to bleeding in the brain or other serious symptoms." *Dural arteriovenous fistulas*, MAYOCLINIC.ORG, https://www.mayoclinic.org/diseases-conditions/dural-arteriovenous-fistulas/symptoms-causes/syc-20364280 [https://perma.cc/4TSZ-SHZE].

a CT scan, which showed a "stable IPH."[14] *Id.* On May 30, 2023, Washburn was discharged from St. Mary's. *Id.* at PageID.14.

But she then presented back to MyMichigan–West Branch on that same day. *Id.* That day, Washburn came under the care of emergency medicine physician Gerardine Villanueva[15]. *Id.* Washburn allegedly reported to Villanueva that, after her discharge from St. Mary's, "she felt that her entire body was weak so she laid down on the floor and crawled to the door" and also reported that her "entire body was quivering." *Id.* She was also concerned that she may have suffered a seizure. *Id.* During this presentment, Washburn underwent another CT of her head, without contrast, which showed no significant change in her hemorrhage from her previous scans. *Id.* at PageID.15. Villaneuva performed the MSE, and part of her differential diagnosis included an intracranial hemorrhage, migraine headaches, post-hemorrhage headaches, and infection. *Id.* Washburn also had an elevated white blood cell count and was instructed to follow up with her primary care physician and hematology and oncology. *Id.* It is unclear from the pleadings whether Washburn was discharged that day or sometime later. *See id.* Plaintiff alleges that, again, Washburn was discharged without being stabilized. *Id.* at PageID.16.

Four days later, on June 3, 2023, Washburn presented again to Defendant MyMichigan–West Branch for the fifth time, complaining of a severe headache accompanied by nausea and "extreme generalized weakness." *Id.* Another CT scan of her head was obtained, showing that her hematoma was unchanged, but there was a minimal leftward midline shift[16] of 6mm compared to

---

[14] "A parenchymal hemorrhage, or an intraparenchymal hemorrhage (IPH), is a bleed that occurs in the brain parenchyma, the functional tissue in the brain consisting of neurons and glial cells." *Parenchymal Hemorrhage*, OSMOSIS.ORG, https://www.osmosis.org/answers/parenchymal-hemorrhage.

[15] Physician Villanueva is also not a Defendant in this lawsuit.

[16] "A midline shift occurs when something pushes this natural centerline of the brain to the right or to the left." Eva Hvingelby, *Midline Shift After Head Trauma*, VERYWELLHEALTH.COM,

the original 4mm. *Id.* She was again transferred to St. Mary's for a neurological consultation. *Id.* There, doctors at St. Mary's reviewed the CT done at MyMichigan–West Branch and noted a "mild increase in edema but improving IPH." *Id.* at PageID.17 (emphasis omitted). On June 4, 2023, she was discharged from St. Mary's with instructions to follow up with a repeat CT scan in two weeks. *Id.*

Two days later, on June 6, 2023, Washburn presented to Beaumont Health—Oakwood Hospital and Medical Center[17] ("Beaumont"). *Id.* At Beaumont, she repeated her complaints of a severe headache, this time accompanied by blurry vision, double vision, dizziness, and nausea. *Id.* Seemingly, she was discharged. *See id.* On June 12, 2023, Washburn presented a second time to Beaumont for a repeat CT scan, which showed a "redemonstration of hemorrhagic areas as well as a leftward midline shift of 4mm." *Id.* (emphasis omitted). Seemingly, she was discharged again. *See id.*

On July 31, 2023, Washburn presented back to Defendant MyMichigan–West Branch, this time complaining of left-sided weakness. *Id.* At that point, Washburn was "able to talk with slurred speech," and had left-sided weakness in her upper and lower extremities and had a left facial droop. *Id.* Washburn also received another CT of her head, which revealed a "new large intraparenchymal bleed measuring approximately 7.5 x 3.8 x 4.5 cm with a leftward 1.1 cm midline shift." *Id.* at PageID.18 (emphasis omitted). Washburn was then transferred to MyMichigan Medical Center—Midland[18] ("Midland"). *Id.* The next day, August 1, 2023, Washburn underwent an MRI, which

---

https://www.verywellhealth.com/the-brain-can-undergo-a-midline-shift-1720044 [https://perma.cc/C34C-XG5M].

[17] Beaumont Health —Oakwood Hospital and Medical Center is not a Defendant in this lawsuit.

[18] MyMichigan Medical Center—Midland is not a named Defendant in this lawsuit.

"demonstrated evidence of ischemia[19] as well as extensive hemorrhagic products in the right hemisphere and a small hemorrhage in the left hemisphere, while missing several brainstem reflexes." *Id.* On August 4, 2023, Washburn underwent yet another CT scan, which showed "an increased edema and mass effect[20] [as] well as an 8mm midline shift, in comparison to the previous 4mm midline shift." *Id.*

Because of her worsening condition and decline in health, Washburn's family decided to undertake "terminal weaning and palliative care." *Id.* Four days later, on August 8, 2023, Washburn passed away. *Id.*

**B.**

On May 12, 2025, Plaintiff filed this case against MyMichigan–West Branch and its parent company, MyMichigan Health, having been appointed the personal representative of the estate of Washburn by the Roscommon County Probate Court. ECF No. 1.

Plaintiff's Complaint pleads one claim under the Emergency Medical Treatment and Active Labor Act (EMTALA): that Defendants failed to provide either appropriate medical screening to Washburn *or* stabilize her emergency medical conditions before discharging her under 42 U.S.C.

---

[19] "Cerebral ischemia or brain ischemia, is a condition that occurs when there isn't enough blood flow to the brain to meet metabolic demand." *Cerebral Ischemia*, COLUMBIA UNIVERSITY NEUROSURGERY, https://www.neurosurgery.columbia.edu/patient-care/conditions/cerebral-ischemia [https://perma.cc/BV64-YBKH].

[20] A "mass effect" is when an intracranial lesion increases intracranial pressure and displaces the soft tissues of the brain. *See Acute CT Brain Mass Effect*, RADIOLOGY MASTERCLASS, https://www.radiologymasterclass.co.uk/tutorials/ct/ct_acute_brain/ct_brain_mass_effect.

§§ 1395dd(a),[21] 1395dd(b).[22] *See* ECF No. 1 at PageID.19–24. Specifically, Plaintiff contends that Washburn suffered from EMCs when in the care of Defendants, and that Defendants failed to stabilize her before discharging her during her emergency room visits on May 13, 2023, May 24, 2023, May 25, 2023, and May 30, 2023—resulting in her deterioration and death. *Id.* at PageID.21.

On June 23, 2025, Defendants moved to dismiss and, in the alternative, to strike images of Defendant MyMichigan–West Branch's doctors who treated Washburn and certain images of Washburn's medical history. ECF No. 7.

## II.

### A.

Under Civil Rule 12(b)(6), a pleading fails to state a claim if it does not contain allegations that support recovery under any recognizable theory. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When considering a Rule 12(b)(6) dismissal, the court accepts all factual allegations of the complaint as true and will construe the pleading in favor of the nonmovant. *See Lambert v.*

---

[21] Plaintiff does not expressly plead a violation of 42 U.S.C. §§ 1395dd(a) for different screening. *See* ECF No. 1 at PageID.19–24. But Defendants respond to a violation of 42 U.S.C. §§ 1395dd(a) in their motion to dismiss as if Plaintiff *had* pleaded such a violation. *See generally* ECF No. 7. And in Plaintiff's response to Defendant's Motion to Dismiss, Plaintiff addresses a violation under 42 U.S.C. §§ 1395dd(a). *See generally*, ECF No. 10. In the Sixth Circuit, "where language in a complaint is ambiguous, [the Sixth Circuit] has used a 'course of the proceedings test' to determine whether defendants have received notice of the plaintiff's claims." *Carter v. Ford Motor Co.*, 561 F.3d 562, 566 (6th Cir. 2009); *see also Harris v. Bornhorst*, 513 F.3d 503, 525 (6th Cir. 2008) (Griffin, J., concurring in part and dissenting in part) (under the course of the proceedings exception, "claims that are tried by the mutual consent of the parties are treated as if they were pleaded"). Thus, the Court will evaluate whether Plaintiff has pleaded facts sufficient to state a claim for a violation of 42 U.S.C. §§ 1395dd(a).

[22] Plaintiff's Complaint contains two counts, but "Count II" seemingly seeks damages under both a Wrongful Death and Survival Action pursuant to Mich. Comp. Laws §§ 600.2922, 600.2921. *See* ECF No. 1 at PageID.25–27. The Michigan Supreme Court has stated that Wrongful Death and Survival Actions do not create an independent claim; instead, they are a filter through which the underlying claim can proceed. *See Wesche v. Mecosta Cnty. Rd. Comm'n*, 746 N.W.2d 847, 856 (Mich. 2008) ("Our textual analysis is supported by caselaw stating that the wrongful-death act is essentially a "filter" through which the underlying claim may proceed.").

*Hartman*, 517 F.3d 433, 439 (6th Cir. 2008). The plaintiff need not provide "detailed factual allegations" to survive dismissal, but the "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In essence, at this stage of litigation, courts generally assess only the facts pleaded in the plaintiff's complaint—not evidence elsewhere in the record—and the complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678–79; *see also Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 979 F.3d 426, 440 (6th Cir. 2020); *cf. Thomson v. Peterson*, No. 1:24-CV-11761, 2025 WL 2797146, at *4 (E.D. Mich. Sept. 30, 2025) (explaining when courts can look beyond the face of the complaint). But the court need not accept the complaint's legal conclusions as true. *Iqbal*, 556 U.S. at 678–79 (quotations and citation omitted).

**B.**

In 1986, Congress enacted EMTALA as part of the Consolidated Omnibus Budget Reconciliation Act (COBRA) of 1985. *See Molra Smith, et. al.*, EMRA.ORG, https://tinyurl.com/wxef33x6 [https://perma.cc/9Y54-K362]. "The act was passed in response to the widespread practice of 'patient dumping' from mostly private community hospitals to county hospitals." *Id.* At the time, up to 250,000 people a year were being transferred because they could not afford their care. *Id.* In fact, patients of certain underprivileged backgrounds were affected the most*;* Cook County, for example, noted that "89% of patient transfers were minorities, 87% lacked employment, only 6% of these patients had given consent for transfer, and 24% of patients transferred had unstable conditions." *Id.* Patients were also twice as likely to die because of these transfers. *Id.*

Thus, EMTALA ensures an unequivocal right to emergency healthcare, regardless of means to pay. *Id.* EMTALA guarantees a screening exam and stabilizing treatment, including hospitalization. *Id.* But it is an unfunded mandate—making EMTALA especially controversial given its scope continues to expand; yet remains without funding to this day. *Id.* In consequence, with a growing number of emergency department ("ED") visits, and a large proportion of uninsured patients, the financial burdens have been so great as to cause closure—especially in smaller and urban hospitals. *See William TenBrink, et. al*, EMRA.ORG, https://www.emra.org/books/advocacy-handbook-2019/impact-of-emtala [https://perma.cc/52CA-VQZ9]. While, emergency physicians have benefited from the increase in insured patients under the Affordable Care Act, under EMTALA it is still not enough. *Id.*

Still, "[o]nce EMTALA has met that purpose of ensuring that a hospital undertakes stabilizing treatment for a patient who arrives with an emergency condition, the patient's care becomes the legal responsibility of the hospital and the treating physicians," and "the legal adequacy of that care is then governed not by EMTALA but by the state malpractice law that everyone agrees EMTALA" did not preempt. *Bryan v. Rectors & Visitors of Univ. of Virginia*, 95 F.3d 349, 351 (4th Cir. 1996).

Plaintiff asserts that Defendants' conduct violated 42 U.S.C. §§ 1395dd(a) and 1395dd(b) under EMTALA. EMTALA applies to all hospitals that participate in Medicare and have an "emergency department,"[23] imposing two requirements:

> First, for any individual who "comes to the emergency department" and requests treatment, the hospital must "provide for an appropriate medical screening examination ... to determine whether or not an emergency medical condition ... exists." 42 U.S.C. § 1395dd(a). Second, if "the hospital determines that the individual has an emergency medical condition, the hospital must provide either (A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may

---

[23] Defendants do not dispute that their hospitals are covered by EMTALA. *See* ECF Nos. 7; 11.

be required to stabilize the medical condition, or (B) for transfer of the individual to another medical facility [.]" § 1395dd(b).

*Moses v. Providence Hosp. & Med. Centers, Inc.*, 561 F.3d 573, 579 (6th Cir. 2009). These requirements will be addressed in turn below.

### *i. Appropriate Medical Screening*

Start with screening. For any individual who seeks treatment in a hospital covered by EMTALA, that hospital must first provide that person with an "appropriate medical screening examination." 42 U.S.C. § 1395dd(a). In *Cleland v. Bronson Health Care Grp., Inc.*, the Sixth Circuit interpreted the phrase "appropriate medical screening" to mean "care similar to care that would have been provided to any other patient, or at least not known by the providers to be insufficient or below their own standards." 917 F.2d 266, 271 (6th Cir. 1990). *Cleland* was clear that "appropriate" did not denote "the full panoply of state malpractice law" or "guarantee of successful result." *Id.* But *Cleland* imparted another standard—requiring some evidence of improper motive—concluding that the inappropriate medical screening had to be *because* of a certain characteristic:

> At the same time, there is not the slightest indication that this outcome would have been any different for a patient of any other characteristics. Had his sex, race, national origin, financial condition, politics, social status, etc., been anything whatsoever, as far as can be gleaned from the complaint, the outcome would have been the same.

*Id.* Thus, *Cleland* concluded that a hospital is liable under § 1395dd(a) if a hospital (1) "provides a substandard (by its standards) or nonexistent medical screening"; (2) "for any reason (including, without limitation, race, sex, politics, occupation, education, personal prejudice, drunkenness, spite, etc.)." *Id.* at 272. So if a hospital acts in the same manner as it would have for any other patient, "then the screening provided is appropriate and 'a plaintiff fails to establish a claim for violation of the screening requirement where there is no evidence of disparate treatment based on

an improper motive.'" *Est. of Lacko, ex rel. Griswatch v. Mercy Hosp., Cadillac*, 829 F. Supp. 2d 543, 549 (E.D. Mich. 2011) (quoting *Garrett v. Detroit Med. Ctr.*, No. 06–10753, 2007 WL 789023, at *3 (E.D. Mich. March 14, 2007).

Plaintiff argues that Defendants failed to provide appropriate medical screening because they did not provide Washburn with "including, but not limited to, diagnostic imaging" ECF No. 10-1 at PageID.102 (emphasis omitted). In the Complaint, Plaintiff also includes a list of things she contends Defendants did not do:

> a) DID NOT to do (sic) everything within its capabilities to minimize the risks to Ms. Washburn's health;
>
> b) DID NOT arrange for another hospital to accept Ms. Washburn in transfer;
>
> c) DID NOT send appropriate data regarding Ms. Washburn to an accepting hospital facility;
>
> d) DID NOT effect Ms. Washburn's transfer through qualified personnel and transport services;
>
> e) DID NOT re-assess Ms. Washburn at the time of discharge to confirm whether or whether not her EMCs were stabilized or whether she should be appropriately transferred;
>
> f) DID NOT inform Ms. Washburn of its obligations under EMTALA and the risks of premature discharge;
>
> g) DID NOT provide treatment until Ms. Washburn was stabilized, or if it did not have the capability, transfer Ms. Washburn to another hospital;
>
> h) IMPROPERLY DISCHARGED Ms. Washburn without formulating a plan for subsequent outpatient medical treatment consistent with medical routine that would not jeopardize Ms. Washburn's health;
>
> i) Other violations as shall be revealed in discovery.

ECF No. 1 at PageID.23 (emphasis in original omitted).

But Plaintiff does not identify facts indicating that these actions were *standard* for Defendants' care. *See generally*, ECF No. 1. Under the *Cleland* framework, a violation of § 1395dd(a) requires both an improper motive and a hospital's provision of substandard care by its

own standards. *See* 917 F.2d at 272 ("A hospital that provides a *substandard (by its standards)* or nonexistent medical screening for any reason (including, without limitation, race, sex, politics, occupation, education, personal prejudice, drunkenness, spite, etc.) may be liable under this section") (emphasis added). Plaintiff does not plead that failing any of the actions they deem required for appropriate medical screening were *standard* procedures in either the MyMichigan–West Branch hospital or MyMichigan Health's hospital system generally. *See* ECF No.1.

Further, much of what Plaintiff seemingly believes would constitute "appropriate" medical screening would be equivalent to curing Washburn. But the Sixth Circuit is clear that EMTALA does not "include[] a guarantee of successful result." *Cleland*, 917 F.2d at 271. And courts have concluded that claims that imaging should have been ordered sound in medical malpractice—not EMTALA claims. *See Stringfellow v. Oakwood Hosp. & Med. Ctr.*, 409 F. Supp. 2d 866, 871 (E.D. Mich. 2005). Thus, because Plaintiff does not state facts reflecting that Washburn received substandard care, Plaintiff's EMTALA claim of inappropriate screening arising under 42 U.S.C. § 1395dd(a) will be dismissed without reaching the separate question of whether the Defendants had an improper motive.[24]

### ii. Emergency Medical Condition (EMC)

Turn to EMCs. A plaintiff can also state a claim for EMTALA under § 1395dd(b) if a hospital determines that an individual has an EMC, and the hospital fails to "stabilize" her before discharge. *See Moses*, 561 F.3d at 579. Further, under § 1395dd(b), "a hospital's duty to provide the treatment necessary to stabilize a patient's emergency medical condition arises only if the

---

[24] Plaintiff devotes several pages to the argument that this Court should "not use the *Cleland* 'improper motive' element as the threshold standard for establishing 'appropriate medical screening' under 42 U.S.C. § 1395dd(a)." ECF No. 10-1 at PageID.96–103. But this Court is bound by the Sixth Circuit's precedent. Whether this Court reached the improper motive standard or not, it would not have been able to ignore clear precedent, as Plaintiff suggests.

hospital actually detects such a condition." *Elmhirst v. McLaren N. Michigan*, 726 F. App'x 439, 444 (6th Cir. 2018); *see also Cleland*, 917 F.2d at 271 ("If the emergency nature of the condition is not detected, the hospital cannot be charged with failure to stabilize a known emergency condition.").

The statute defines EMC as "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in . . . [inter alia] placing the health of the individual . . . in serious jeopardy[.]" *Id.* (citing § 1395dd(e)(1)(A)(i)).

"To stabilize" a patient with an EMC means "to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility[.]" *Id.* (quoting § 1395dd(e)(3)(A)). "Transfer" is defined in the statute to include moving the patient to an outside facility or discharging them. *Id.* (citing § 1395dd(e)(4)).

Plaintiff contends that Washburn was not stabilized before discharge during her visits on May 13, 2023, May 24, 2023, May 25, 2023, and May 30, 2023. ECF No. 1 at PageID.22. Plaintiff argues that Washburn suffered from several different EMCs, including "intracranial hemorrhage with a 4mm midline shift, intraparenchymal hematoma, and infection manifested by acute symptoms of sufficient severity." *Id.*

Defendants argue that they are not liable under § 1395dd(b) because they did not identify that Washburn had an EMC on any of the dates Plaintiff cites. ECF No. 7 at pageID.52 Instead, it wasn't until Washburn needed immediate medical treatment on July 31, 2023, that she presented with an EMC, and Defendant argues she was both stabilized and transferred at that time to undergo surgery for a new, significant intraparenchymal bleed. *Id.* at PageID.52–53.

But this Court must accept all well-pled factual allegations in the Complaint as true when reviewing a motion to dismiss and will construe the pleading in favor of the nonmovant. *See Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008). Plaintiff pleads that Washburn suffered from several different types of EMC's, including an intracranial hemorrhage and intraparenchymal hematoma. *See* ECF No. 1 at PageID.22. And online resources indicate that both can be life-threatening. *See Brain Bleed, Hemorrhage (Intracranial Hemorrhage)*, CLEVELANDCLINIC.ORG, https://my.clevelandclinic.org/health/diseases/14480-brain-bleed-hemorrhage-intracranial-hemorrhage [https://perma.cc/TQN5-SPFB]; *see also Intracranial Hematoma*, MAYOCLINIC.ORG, https://www.mayoclinic.org/diseases-conditions/intracranial-hematoma/symptoms-causes/syc-20356145 [https://perma.cc/DM2P-JZBC].

Plaintiff pleads that Defendants—through their hospital staff—wrote down at least the suggestion of an intracranial hemorrhage as part of a differential diagnosis for Washburn during presentments on May 24, 2023, *see* ECF No. 1 at PageID.9, May 25, 2023, *see id.* at PageID.10, and May 30, 2023.[25] *See id.* at PageID.15. And "while actual knowledge is required, 'any hospital employee or agent that has knowledge of a patient's emergency medical condition might potentially subject the hospital to liability under EMTALA.'" *Moses*, 561 F.3d at 585 (quoting *Roberts ex rel. Johnson v. Galen of Virginia, Inc.*, 325 F.3d 776, 788 (6th Cir. 2003)). Because Defendants' doctors recorded at least some of the conditions Washburn contends are EMCs as part of their differential diagnosis, Plaintiff has pled facts indicating that Defendant had actual knowledge of Washburn's EMCs on at least four separate presentations before June 31, 2023, where Defendants argue they first knew. ECF No. 7 at pageID.52–53.

---

[25] Defendants argue that "the only condition [they] ascertained up until May 27 was a headache." ECF No. 11 at PageID.181. But this is contradicted by the facts pled in the Complaint and Washburn's medical records. *See generally*, ECF No. 1.

Next, this Court must determine whether Plaintiff has pled facts to reflect that Washburn was not stable before her discharge on either May 13, 2023, May 24, 2023, May 25, 2023, or May 30, 2023. She has. Plaintiff pleads that Defendant MyMichigan–West Branch did not stabilize her before discharge on either May 13, 2023, May 24, 2023, May 25, 2023, or May 30, 2023, and—because of this failure—"her EMCs deteriorated, resulting in Washburn's untimely death." ECF No. 1 at PageID.21.

Defendant argues that Washburn's condition "did not 'materially deteriorate' until months after the ED presentation alleged in the Complaint," which they argue is demonstrated by the fact that she did not suffer complications or death until early August of 2023. ECF No. 11 at PageID.181. But a patient with an EMC is only "stabilized" when "no material deterioration of the condition *is likely*, within reasonable medical probability, to result from or occur during" the patient's release from the hospital. *See Moses*, 561 F.3d 573 at 582 (quoting 42 U.S.C. § 1395dd(e)(3)(B) (emphasis added)). So the standard is not whether a patient actually *deteriorates*, but whether they were likely to deteriorate following discharge. Plaintiff has pled facts that, after Washburn's discharge from Defendants' care on May 13, 2023, May 24, 2023, May 25, 2023, and May 30, 2023, there was a likelihood of a "material deterioration" of her condition.

Thus, while Plaintiff has not pleaded facts to survive Defendants' Motion to Dismiss under 42 U.S.C. § 1395dd(a), she has under 42 U.S.C. § 1395dd(b). As a result, Plaintiff's EMTALA claim will be dismissed to the extent it relies on an inadequate screening theory, but not as it pertains to a theory under a failure to stabilize an EMC.

### III.

Lastly, Defendants seek to strike images of both the medical practitioners who treated Washburn and Washburn's medical record presented within the body of the Complaint. ECF No. 57 at PageID.53–54.

### A.

Under Rule 12(f), "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." FED. R. CIV. P. 12(f). "Motions to strike are viewed with disfavor and are not frequently granted." *Operating Eng'rs Loc. 324 Health Care Plan v. G & W Constr. Co.*, 783 F.3d 1045, 1050 (6th Cir. 2015). "The function of the motion is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with them early in the case." *Id.* (internal quotation marks omitted).

"Although [m]otions to strike are viewed with disfavor, such motions are properly granted when plaintiffs would succeed despite any state of the facts which could be proved in support of the defense." *Hemlock Semiconductor Operations, LLC v. SolarWorld Indus. Sachsen GmbH*, 867 F.3d 692, 697 (6th Cir. 2017) (internal quotation marks omitted). "However, a motion to strike is not intended to furnish an opportunity for the determination of disputed and substantial questions of law." *Adams v. Hyman Lippitt*, P.C., No. 05-72171, 2005 WL 3556196, at *21 (E.D. Mich. Dec. 29, 2005) (internal quotation marks omitted), vacated in part on other grounds, No. 05-72171, 2006 WL 901703 (E.D. Mich. Apr. 3, 2006).

### B.

Plaintiff includes several images of Washburn's medical providers, ECF No. 1 at PageID.6, 9, 12, 14, and Washburn's medical records, *id.* at PageID.7, 10, 12, 13, 14, 15, 19. Defendant argues that these images should be stricken from the Complaint under Rule 12(f). *See* ECF No. 7 at PageID.53–55.

Begin with the pictures of Washburn's physicians. Those images will be stricken because they are "impertinent." Under Rule 12(f), "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." FED. R. CIV. P. 12(f). "An allegation is 'impertinent' or 'immaterial' when it is not relevant to the issues involved in the

action." *Id.* (quoting *Cobell v. Norton*, 224 F.R.D. 1, 5 (D.D.C. 2004)). Here, the images—that is to say, "pictures"— of Washburn's doctors are not relevant to Plaintiff's EMTALA claim. They add no additional information than what is already stated in the facts and can only serve to embarrass the physicians who treated Washburn. They will thus be struck.

Now turn to the images of Washburn's medical records. Defendant argues that these images should be stricken because they are "redundant" and could have been attached as exhibits. ECF No. 7 at PageID.54–55. "'[R]edundant matter, as contemplated by Rule 12(f), refers to allegations that constitute a needless repetition of other averments in a pleading." *Cobell*, 224 F.R.D. at 3. Plaintiff has included most of the information from the images verbatim in her complaint *and* has also added the images. *See* ECF No. 1 at PageID. 7, 10, 12, 13, 14, 15, 19. Because Plaintiff already includes the information from the images in the text of the Complaint, the images themselves are a needless repetition; thus, they will also be stricken.[26]

## IV.

Accordingly, it is **ORDERED** that Defendants' Motion to Dismiss, ECF No. 7, is **GRANTED IN PART** as it pertains to Plaintiff's EMTALA claims arising under 42 U.S.C. § 1395dd(a).

Further, it is **ORDERED** that Defendant's Motion to Dismiss, ECF No. 7, is **DENIED IN PART** as it pertains to Plaintiff's claims arising under 42 U.S.C. § 1395dd(b).

---

[26] The Court notes that Washburn's medical records may be more pertinent in a motion for summary judgment.

Further, it is **ORDERED** that Defendants' Motion to Strike, ECF No. 7, is **GRANTED**, and the images of Washburn's physicians and medical records will be struck from the Complaint, ECF No. 1.

Further, it is **ORDERED** that Plaintiff is to resubmit her Complaint, ECF No. 1, with the Court absent the images that the Court has instructed her to strike.

**This is not a final order and does not close this case.**

Dated: January 26, 2026                             s/Thomas L. Ludington
                                                    THOMAS L. LUDINGTON
                                                    United States District Judge

- 20 -